IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL LOPEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. 1:11-CV-189 |
| | § | |
| PATRICK R. DONAHOE, | § | |
| POSTMASTER GENERAL OF THE | § | |
| UNITED STATES POSTAL SERVICE, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

BE IT REMEMBERED, that on March 23, 2015, the Court considered Defendant's Motion and Memorandum in Support for [sic] Summary Judgment, Dkt. No. 51; Plaintiff Daniel G. Lopez's Brief in Response to Defendant's Motion for Summary Judgment, Dkt. No. 53; and Defendant's Reply to Plaintiff Daniel Lopez's Response to Defendant's First Motion for Summary Judgment, Dkt. No. 54. For the following reasons, the Court grants this motion in part and denies it in part, finding that Plaintiff has made out a prima facie retaliation claim under Title VII, 42 U.S.C. §§ 2000e-1 et seq.

## I. Background

Plaintiff Daniel Lopez ("Lopez"), a Mexican-American man, works as a letter carrier for the U.S. Postal Service in Brownsville, Texas. *See* First. Am. Compl. ¶ 4, 9, Dkt. No. 34; Ans. To Pl.'s Am. Compl. ¶ 4, 9, Dkt. No. 37; *see also* Am. Compl. ¶ 16 (alleging Lopez worked for U.S. postal service since 1995); Decl. of Daniel Lopez ¶ 1, Dkt. No. 53 Ex. 8. He brings claims against Patrick R. Donahoe ("Donahoe"), in his capacity as the Postmaster General of the U.S. Postal Service, under 42 U.S.C. §2000e et. seq. ("Title VII"). *See* Pl.'s First Am. Compl. ¶¶ 18–20. His claims center on the tenure of Jeffrey Jenkins ("Jenkins") who became Postmaster General in

1

Brownsville "in the latter part of 2007." *Id.* ¶ 9; *see also* Am. Ans. ¶ 9 (admitting Jenkins became postmaster during this time period).   Defendant moves for summary judgment. Dkt. No. 51.

A. Procedural History

Three Plaintiffs originally filed this action: Lopez, Gerardo Trevino ("Trevino"), and Jamie Mendez ("Mendez") (collectively "Plaintiffs").  Pls.' Compl. 1, No. 1:11-CV-00189, Dkt. No. 1.  On May 12, 2011, Trevino, Lopez, and Mendez commenced what is now No. 1:11-CV-189 in the McAllen Division of this Court.  *Id.*  They bring Title VII claims under theories of race/national-origin discrimination, retaliation, and hostile work environment. *Id.* at 1.

On September 19, 2011, the Court issued an order transferring this case to the Brownsville Division.  Order of Transfer, No. 1:11-CV-00189, Dkt. No. 18.  On December 1, 2011, Donahoe filed a motion to sever Plaintiffs' claims.  No. 1:11-CV-00189, Dkt. No. 22.  Donahoe argued that under Rules 20 and 21 of the Federal Rules of Civil Procedure, Plaintiffs' claims should be severed into three separate lawsuits on the basis of misjoinder.  *Id.* at 1.  This Court granted that motion on March 12, 2012, explaining that "Jenkins's presence might be a factual element that links plaintiff's claims, but it is not a transaction or occurrence sufficient to fulfill the first prong of a joinder analysis."  Order 5, No. 1:11-CV-00189, Dkt. No. 31.  Accordingly, the Court severed Cause No. 1:11-CV-00189 into a separate action for each plaintiff: Daniel Lopez v. Patrick Donahoe 1:11-CV-00189; Jamie Mendez v. Patrick Donahoe 1:12-CV-00055; and Gerardo Trevino v. Patrick Donahoe 1:12-CV-00056. *Id.* at 6.

Donahoe has filed a motion for summary judgment.  Dkt. No. 51.  In his reply, he raises objections to several of the exhibits Lopez attached to his response. *See* Dkt. No. 54 at 2–13.

B. Summary Judgment Evidence

The Court recites the facts reflected in the summary-judgment record in the light most favorable to Lopez. *See, e.g., Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 32 (5th Cir. 1992) ("Because this case was decided on summary judgment, the acts that Johnson recites as the basis for his . . . claim will be described in the light most favorable to Johnson, the nonmoving party."). Lopez served as the president of the local affiliate of the National Association of Letter Carriers' union in Brownsville in 2008. *See* Decl. of Daniel Lopez ¶ 3. Dkt. No. 53 Ex. 8. According to Lopez's declaration, Ray Finley ("Finley"), a custodial employee, told Lopez that he overheard Jenkins say "where did all these f__king Mexicans come from?" *Id.* ¶ 4. In his deposition, Finley denied making this statement and suggested that he heard Jenkins say that he wanted to "get rid of some dead weight." Dkt. No. 53 Ex. 7 at 16:2–3. Other portions of Finley's deposition testimony can also be viewed in the light most favorable to Lopez as stating that Finley could not recall telling Lopez and other post office employees about the "f__king Mexicans" comment. *See id.* at 15:18—25.

One of Lopez's coworkers, Trevino, told Lopez that Finley related this story to him as well. Decl. of Daniel Lopez ¶ 5. Trevino and Lopez, acting in his role as union president, wrote letters to postal service management complaining about this alleged comment and their observations of Jenkins's conduct. *See id.* Lopez also assisted Trevino in prosecuting an unspecified number of Equal Employment Opportunity (EEO) complaints. *See id.* ¶ 9.

1. Lopez's Allegations and Declaration

In his amended complaint, Lopez claims that Jenkins and other management employees began a pattern of retaliation against him for this activity and created a hostile work environment. *See* Am. Compl. ¶ 10. Lopez alleges that "he was not allowed to bid on an assignment that he was entitled to bid upon." *Id.* He further pleads that he "was bumped off and [the assignment] was given, in violation of Contract and established seniority, to a junior White employee. The harassment and retaliation was so severe against Plaintiff Lopez that he suffered a heart attack." *Id.* ¶ 15; *see also* Lopez Decl. ¶ 15 (describing heart attack of June 1, 2009).

At his deposition, Lopez explained that a postal service employee can bid on a temporary assignment, as when another postal carrier goes on vacation, and the assignment will be awarded based on seniority. *See* Dep. of Daniel Lopez 62:13–16, Dkt. No. 51 Ex. 1.

On August 14, 2008, Lopez was involved in an automobile accident while apparently driving a postal vehicle. *See* Lopez Decl. ¶¶ 11, 12 (stating that Lopez damaged one brick of a mailbox). The next day, Jenkins suspended Lopez's driving privileges. *Id.* According to Lopez, an immediate supervisor normally conducts an investigative interview after an accident, but Jenkins interviewed Lopez himself. *See id.* Furthermore, Jenkins allegedly suspended Lopez before conducting the interview in violation of the applicable procedure. *See id.* Finally, Lopez states that applicable policies require a decision to be made within fourteen days. *See id.* Jenkins exceeded that time limit, and Lopez "could only work about two to four hours a day" as a result. *Id.*

Lopez states that, on December 2, 2008, he began to feel sick after he and a union member were involved in a confrontation with a postal service manager. *See id.* ¶ 13. He told that supervisor that he was feeling ill, submitted a leave request form, and returned the next day with a doctor's note. *Id.* He was nonetheless issued a notice of a fourteen-day suspension on December 4, 2008, for being away without leave. *Id.*; *see also* Am. Compl. ¶ 12 (alleging that leave documentation was deleted from postal service computers). Lopez states that the fourteen-day suspension letter he ultimately received, a copy of which is not in the record, falsely stated that he was previously issued a warning letter and given a seven-day suspension. *See* Lopez Decl. ¶ 13. Moreover, Lopez states that suspension letters must be issued within fourteen days, yet he received his thirty-six days after the incident in question. *See id.* He also states in his declaration that the suspension was "later thrown out by the Step B Team." *Id.* Finally, on December 26, 2008, Jenkins caused an undated document proposing to terminate Lopez to be issued for Lopez. Lopez Decl. ¶ 14.

Lopez further declares that:

6. "Postmaster Jenkins was hostile, aggressive, combative and unfair when he dealt with Hispanic carriers. He would shout at them, harass them, and belittle them. It was a direct contrast to how he interacted with Anglo employees. One example was when a number of carriers were waiting on the registry clerk to clear certified mail, registered mail, COD's. Postmaster Jenkins walked up and started shouting at them as to why they were standing there. Carrier Carlos Rodriguez tried to explain and Postmaster Jenkins told him to "shut up, that he didn't ask him anything." When carrier Rodriguez again tried to tell him he was only trying to answer, he was jumped on again. Postmaster Jenkins shadowed carrier Rodriguez back to his case. But any interaction with an Anglo employee was different as night is to day. It was obvious.

7. "One example is Ken Jenks, an Anglo carrier, who cases the route next to me, broke his toe. The injury was off duty. There is no[] obligation to provide him work because of it was an off the job injury. Jenks was allowed to work. I was not. Mr. Trevino was not. When Postmaster Jenkins would talk to carrier Jenks, he talk to him like he was a friend. When he spoke to me or to Mr. Trevino, he implied we were lazy. He looked down at you and he did not speak in a friendly manner.

8. "An Anglo supervisor, Cynthia Hampton, refused a direct order given to her by Postmaster Jenkins. She walked away, went into a storage room and shut the door. Postmaster Jenkins did nothing to her. But I have seen him shout, yell, and belittle Hispanic supervisors in front of everyone.

Lopez Decl. ¶¶ 6–8 (quotation marks in original).   In support of its motion for summary judgment, Donahoe supplies excerpts of Lopez's deposition which Donahoe contends conflict with this declaration.  Dkt. No. 51 Ex. A.

2. <u>Declarations of Other Brownsville Post Office Employees</u>

In addition to his own declaration, Lopez attaches to his response to Donahoe's motion for summary judgment eight declarations of other Hispanic individuals who worked in the Brownsville post office in 2008.  *See* Dkt. No. 53 Ex. 1–6, 8–10.  By way of illustrating the contents of these declarations, each of two employees reports that Jenkins mocked his accent in his presence.[1]  *Id.* Ex. 3 ¶ 5; *Id.* Ex. 4 ¶ 5.  One

---

[1] The third employee Plaintiff cites reports that Jenkins mocked the accent of another employee but does not specify his basis of knowledge.  See id. Ex. 6 ¶ 3.  The Court therefore does not consider this evidence for purposes of resolving the instant motion.

employee reports that Jenkins described post office employees as "Mess-i-cans" and stated that "the Mess-i-cans are taking Texas back." *Id.* Ex. 2 ¶ 4.  The same employee, a pass-through clerk who worked in the Brownsville post office, states that Jenkins would meet with customers who had what he perceived as Anglo surnames but would not meet with customers with what he perceived as Hispanic surnames. *See id.* ¶ 5.  Another employee reports that Jenkins made disparaging comments about Hispanic employees at safety talks and stand-up talks. *Id.* Ex. 4 ¶ 5.  Additionally, Lopez and another employee aver that Jenkins shouts at Hispanic supervisors and employees but does not shout at Anglo employees. *See id.* Ex. 4 ¶ 8; *Id.* Ex. 8 ¶¶ 6, 8.  In his reply, Donahoe moves to exclude much of this evidence, contending variously that it is irrelevant or not based on personal knowledge. *See* Fed. R. Civ. P. 56(c)(2).

## II. Governing Law

### A. Summary Judgment Standard

A motion for summary judgment must be granted when the movant establishes that the pleadings, affidavits, and other evidence available to the Court demonstrate that no genuine issue of material fact exists, and the movant is thus entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must view all evidence in the light most favorable to the non-moving party. *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891.  Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Thus, the Court will not, "*in the absence of proof, assume that the nonmoving party could or would prove the*

*necessary facts.*" *Id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *see also TIG Ins. Co. v. Eagle, Inc.*, Civ. Action No. 05-0179, 2007 WL 861153, at *2 (E.D. La. 2007) (quoting *Little*, 36 F.3d at 1075).

The non-movant has no duty to respond to a motion for summary judgment until the moving party carries its initial burden of showing that no genuine issue of fact exists. *See Lockett*, 337 F. Supp. 2d at 891 (citing *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993)). However, if the movant carries its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett*, 337 F. Supp. 2d at 891; *see also Ashe*, 992 F.2d at 543. The non-movant may not merely rely on conclusory allegations or the pleadings. *Lockett*, 337 F. Supp. 2d at 891. Rather, it must cite specific facts identifying a genuine issue to be tried in order to avoid summary judgment. *See* Fed. R. Civ. P. 56(e); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Thus, once it is shown that a genuine issue of material fact does not exist, "[s]ummary judgment is appropriate . . . if the non-movant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222–23 (5th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

B. <u>Title VII Claims</u>

Title VII of the Civil Rights Act of 1964, codified in 42 U.S.C. §§ 2000e et seq., "creates statutory rights against invidious discrimination in employment and establishes a comprehensive scheme for the vindication of those rights." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 457–58 (1975). Title VII prohibits employers from discriminating against their employees on the basis of their employees' race, sex, national origin, religion, or color (referred to here as "status discrimination").

42 U.S.C. § 2000e-2(a). Title VII also provides that it is unlawful for employers to retaliate against employees who have opposed discrimination or who have participated in actions that are considered "protected activities" under the statute. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001). Courts have interpreted Title VII's protection against status discrimination to include protection against a hostile work environment created by status-based harassment, recognizing that the statute "should be accorded a liberal interpretation in order to effectuate the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination." *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971).

Lopez does not argue in his response to the instant motion that he has submitted direct evidence of discriminatory intent. *See, e.g., Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). Analysis of a Title VII claim based on circumstantial evidence follows a burden-shifting framework, which places the initial burden of production on the plaintiff to establish a prima facie case for each of his claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). If the plaintiff is able to meet his burden, then the burden of production shifts to the defendant, who must demonstrate a legitimate non-discriminatory reason for the alleged adverse employment action. *Id.* If the defendant provides a legitimate non-discriminatory reason for the action, then the burden of production shifts back to the plaintiff to demonstrate that this reason is a pretext for discrimination. *Id.*

When asserting a discrimination claim, the plaintiff can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In retaliation claims the plaintiff cannot simply show that a retaliatory reason was a motivating factor for the adverse decision, because ultimately he "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).

A plaintiff who seeks to meet his burdens must prove his claims by a preponderance of the evidence, while the defendant need only raise a "genuine issue of fact as to whether it discriminated against the plaintiff" by articulating legitimate, non-discriminatory reasons supported by admissible evidence. *Burdine*, 450 U.S. at 254—55.  Throughout this process of burden-shifting, the plaintiff bears "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Id.* at 253

## III. Analysis

Donahoe argues that Lopez has failed to provide sufficient evidence to make out a prima facie case of discrimination, retaliation, and harassment by hostile work environment.  Dkt. No. 51 at 6, 11, 17.  Donahoe also asserts that if Lopez were able to establish a prima facie case on any or all of his Title VII claims, "the record shows that the Postal Service had legitimate non-discriminatory reasons for the contested actions."  *Id.* at 6.  However, he cites no summary-judgment evidence in support of this contention and does not elaborate.  *See id.*  The Court therefore considers Lopez's prima facie case as to each claim. *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) ("[T]o rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee.").

### A. Discrimination Claim

To carry his initial burden on his Title VII discrimination claim, Lopez must establish a prima facie case of discrimination by demonstrating that:

(1) He is a member of a protected group;
(2) He was qualified for the position held;
(3) He suffered an adverse employment decision; and
(4) He was replaced by someone outside that protected group or was treated less favorably than someone outside the protected group.

*McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

### 1. Qualification

Donahoe argues that Lopez has not shown that he met the objective criteria qualifying him for the two hold-down assignments for which he unsuccessfully bid.

A plaintiff seeking to establish a prima facie case of status discrimination must show that he was qualified for the position made the subject of the claim. *Id.* An employer may establish the necessary qualifications for a position, but he "may not utilize wholly subjective standards by which to judge [his] employees' qualifications." *Crawford v. W. Elec. Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980). Hence, "an employee must demonstrate that he meets objective hiring criteria at the *prima facie* case stage." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (citations omitted).

In his deposition, Lopez testified that bid assignments are awarded based on seniority.[2] Dkt. No. 51 Ex. 1 at 62:12—16.  Generally, an employee's seniority  can be objectively determined, and, when seniority was used as a criterion, a Title VII plaintiff must therefore establish that he was qualified by seniority at the prima facie stage. *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 469 (5th Cir. 2001) (holding that sheriff's deputy made out prima face case on this element because, among other things, he "had seniority over every other officer in the Department."); *Smith v. City of Tupelo, Miss.*, No. 1:10CV217-B-S, 2012 WL 777292, at * 3 (N.D. Miss. March 8, 2012) ("find[ing] . . . that . . . some of the criteria may be characterized as objective (for instance, education or seniority)."). Lopez also testified in his deposition that he was senior to Ken Jenks ("Jenks"), the employee who won both bids. Dkt. No. 51 Ex. 1 at 64:3–5. Since a reasonable fact finder could believe this testimony and conclude that Lopez was senior to Jenks, Lopez has carried his summary-judgment burden on his qualification for the hold-down assignments. *See Oden*, 461 F.3d at 469.

2. <u>Adverse Employment Action</u>

---

[2] Lopez does not argue that the seniority system utilized by the Brownsville post office itself evinced discriminatory animas.  Title VII declares that, "[n]otwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e–2(h); *see generally AT&T Corp. v. Hulteen*, 556 U.S. 701, 70811 (2009) (discussing this exception).

Next, Donahoe argues that Lopez cannot show that losing either bid was an adverse employment action. *See* Dkt. No. 51 at 9–10. Lopez responds with several alleged adverse employment actions. Specifically, Lopez alleges that he was subjected to discipline, that he had his driving privileges suspended, that he lost pay during that suspension, that he was issued a 14 Day Suspension letter, and that he was issued a Removal Notice. *See* Dkt. No. 53 at 8. He omits his loss of the two bids to Jenks from this list.

The term "adverse employment actions" is interpreted differently in status discrimination claims and retaliation claims under Title VII. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–63 (2006). The types of employer actions that are considered "adverse employment actions" are identified in Section 703(a) of Title VII (the "anti-discrimination provision"). *Id.* at 61. The Court in *Burlington* noted that the antidiscrimination provision specifically identifies the types of activities that are considered to be "adverse employment actions" as actions dealing with the hiring and firing of employees, actions affecting "compensation, terms, conditions, or privileges of employment," and actions "which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee." *Id.* at 62.

The Fifth Circuit has defined "adverse employment actions" to reach "ultimate employment decisions" that "affect the terms and conditions of employment." *McCoy*, 492 F.3d at 559–60 (noting the difference between discrimination and retaliation claims in the Court's holding in *Burlington*). "Ultimate employment decisions" may include reassignments, in the event that those reassignments involve a "major change in compensation, duties, and responsibilities." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 n.8 (5th Cir. 2004) (citing *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001)). In contrast, "a purely lateral transfer is not an adverse employment action." *Munoz v. Seton Healthcare, Inc.*, 557 F. App'x. 314, 319 (5th Cir. 2014) (per curiam, unpublished) (quoting *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999)).

Viewed in the light most favorable to him, Lopez offers no evidence that the hold-down assignments for which he bid against Jenkins amounted to the equivalence of "purely lateral" temporary transfers. *Id.* The only evidence he offers describes the process of bidding but says nothing about the positions themselves. *See* Lopez Dep. 62:13–16. In particular, he makes no effort to show that either position entitled him to greater pay or benefits. *See, e.g., Munos*, 557 F. App'x. at 319 (affirming summary judgment based on initial transfer and refusal to re-transfer where undisputed evidence showed that everyone with same job title, "regardless of where they were stationed within the hospital, maintained the same pay, benefits, and title"). Accordingly, he has not made out a prima facie case that the denial of either hold-down assignment was an adverse employment action on his discrimination claim.

3. Disparate Treatment

Donahoe asserts that Lopez has not come forward with sufficient evidence showing that the suspension of his driving privileges showing that he was treated less favorably than similarly-situated employees. A plaintiff seeking to establish a prima facie case of status discrimination must demonstrate that he "was replaced by someone outside of his protected group, or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556. To establish this element, a plaintiff must show that the employee who received the more favorable treatment was similarly situated to the plaintiff, and that the incidents used for comparison occurred "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009). For a plaintiff to demonstrate "nearly identical circumstances," he must show that the conduct that prompted the employer's adverse employment decision was "nearly identical" to the conduct of the employee used for comparison. *Id.* at 260. Factors used to determine "nearly identical circumstances" include whether the employees being compared held the same position or had similar responsibilities, whether they shared the same supervisor, and whether they had similar histories of misconduct. *Id.* When the difference between the plaintiff's conduct and the comparator employee's

12

conduct "accounts for the difference in treatment by the employer," the conduct of the two employees is not identical. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001).

Lopez relies on two declarations in his response to show that non-Hispanic postal carriers involved in accidents are similarly situated to him. *See* Flores Decl. ¶ 7, Dkt. No. 53 Ex. 4; Decl. of Daniel Garcia ¶ 4, ibid. Ex. 6; *see also* Dkt. No. 53 at 8 (citing these two declarations to argue that Lopez made out a prima facie case). The first declaration states that:

> "Bill Fiori, an Anglo Letter carrier in the Brownsville Post Office had approximately seven accidents. Mr. Fiori was never suspended or nothing.[sic]   Daniel Lopez, an Hispanic Letter carrier, had a small accident and his driving privileges were suspended and he was sent home. Mr. Castro, also an Hispanic Letter carrier, had a small accident and he was disciplined. [].

Flores Decl. ¶ 7. The second declares:

> "Bill Fiori is an Anglo Letter carrier at the Brownsville Post Office who had several vehicular accidents, but his driving privileges were never revoked. Daniel Lopez is an Hispanic Letter carrier who had one minor accident and his driving privileges were revoked right away and he was sent home.

Garcia Decl. ¶ 6.   Neither declaration provides evidence of whether the alleged accidents involving the comparator, Bill Fiori ("Fiori"), occurred during the tenure of Jenkins or when and how, if at all, disciplinary decisions were made.  Indeed, the first declarant has worked in the Brownsville post office since 2004, Flores Decl. ¶ 1, and the second has worked for the U.S. Postal Service since approximately 1986, Garcia Decl. ¶ 1.   Undisputedly, Jenkins assumed the role of postmaster in Brownsville no later than 2008, four years before the tenure of the declarant who started in Brownsville most recently began.  *See* First Am. Compl. ¶ 9; Ans. To Pl's Am. Compl. ¶ 9.  Nor do these declarations provide a basis from which to infer that the accidents in which Fiori was involved were substantially identical or that Fiori had a disciplinary history similar to Lopez's.  The Fifth Circuit has held that a two-

to-three year lapse in time in which an employee's supervisor changed made employees' circumstances too dissimilar to support a prima facie case. *Arceneaux v. Metro. Life Ins. Co.*, 481 F. Appx. 196, 198–99 (5th Cir. 2012) (per curiam, unpublished). These declarations shed no light on whether Jenkins made any decision regarding any of Fiori's alleged accidents. *See Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 260 (5th Cir. 2009) (listing common supervisor and similar disciplinary histories as factors to be considered in when deciding if employees are similarly situated inquiry); *see also Cardiel v. Apache Corp.*, 559 F. App'x. 284, 289 & n.3 (5th Cir. 2014). As the Fifth Circuit recently put it, viewed in the light most favorable to Lopez, the two declarations on which he relies "show[] only that [Fiori] had an accident in a company vehicle" just as Lopez did, but the declarations do not demonstrate that the accidents were similarly situated enough to make out a *prima facie* case. *Cardiel*, 559 F. App'x. at 289 (so holding based also on uncertainty as to whether company's drug-and-alcohol policy violated).

## B. Retaliation Claim

Donahoe moves for summary judgment on Lopez's retaliation claim, contending that he cannot establish any element of his prima facie case. For Lopez's retaliation claim to survive summary judgment, he must demonstrate that he has satisfied the following three elements of a prima facie case of retaliation:

    (1) He participated in an activity protected under Title VII;
    (2) His employer took an adverse employment action against him; and
    (3) A causal connection exists between the protected activity and the adverse employment action

*McCoy*, 492 F.3d at 557.

### 1. Engaged in Protected Activity Under Title VII

Donahoe claims that Lopez has failed to demonstrate that he participated in an activity that is protected under Title VII. Lopez argues in response that he "engaged in protected activity when he actively represented Gerardo Trevino in his EEO complaints" and when he "had to file his own EEO complaints of race/national origin discrimination and retaliation." Dkt. No. 53 at 9. Lopez states in his

declaration that he assisted Trevino with filing an EEO complaint and filed his own EEO complaint before his driving privileges were suspended and the events of December of 2008.  *See* Lopez Decl. ¶¶ 4–5, Dkt. No. 53 Ex. 8.  Donahoe does not contest these assertions in his reply, Dkt. No. 54.

> Section 704(a) of Title VII (the "anti-retaliation provision"), provides that:
>
> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment … because he has *opposed any practice made an unlawful employment practice by this subchapter*, or because he has *made a charge, testified, assisted, or participated in any manner* in any investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (2012) (emphasis added).  Title VII retaliation claims deal with two types of protected activities, namely opposition activities ("opposed any practice") and participation activities ("made a charge, testified, assisted, or participated in any manner").  *Douglas v. DynMcDermott Petroleum Ops. Co.*, 144 F.3d 364, 372 (5th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).

A plaintiff who wishes to show that his activities fall under the "opposition clause" of § 2000e-3(a) does not need to prove that the employer's actions were actually unlawful; instead he must demonstrate that he had a reasonable belief that those actions were unlawful under Title VII.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007).  Opposition activities need not rise to the level of active resistance, and may include as little as an employee's communication of his belief that his employer has been acting unlawfully.  *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 277–78 (2009).  A Title VII plaintiff can also show that his activities fall under the "participation clause" of § 2000e-3(a) by demonstrating that he has filed an official complaint or participated in another employee's filing of an official complaint that alleges discrimination on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-3(a).  However, participation in a complaint that fails to allege discrimination on one of these bases is not considered protected activity.  *Evans v. Tex. Dept. of Transp.*, 547 F. Supp. 2d 626, 654 (E.D. Tex. 2007) (citing two unpublished Fifth Circuit cases

where plaintiffs failed to demonstrate "protected activity" because their complaints failed to mention discrimination on the basis of any characteristic protected by Title VII).

In his response, Lopez points to two protected activities.  First, according to his declaration, Lopez signed a letter to one or more of Jenkins's supervisors complaining of Jenkins's allegedly racist behavior.  *See* Lopez Decl. ¶ 5.  Lopez adds that he based his letter not only on Finley's report of Jenkins's alleged comment but also on his observations of Jenkins's behavior.  *Id.*; *see also id.* ¶¶ 6–7 (discussing observations of alleged discriminatory treatment).  Taking this evidence together and viewing it in the light most favorable to Lopez permits a finding that Lopez reasonably believed that he was opposing unlawful behavior.  *Compare Turner*, 476 F.3d at 349 (holding plaintiff could not have reasonably believed that request to supervisor to cease making "ghetto children" comments was opposing unlawful employment practice), *with Arango v. Telemundo El Paso*, 20 F. Supp. 3d 559, 567 (W.D. Tex. 2014) (holding complaint of sexual harassment to human resources was protected activity).  Second, though Lopez does not specify the nature of Trevino's complaints, the summary-judgment record permits a reasonable fact finder to conclude in context that Lopez assisted Trevino in filing EEO proceedings, and the charges in those proceedings included claims of discrimination based on the protected categories of race or national origin.  *See* Lopez Decl. ¶ 5.  This evidence therefore suffices to survive summary judgment on the first element of Lopez's *prima facie* retaliation claim. See *Haire v. Bd. of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 367 (5th Cir. 2013) ("Haire's protected activity consists of filing discrimination complaints with the EEOC . . . and sending a rebuttal letter to [university chancellor], so she has clearly met the first prong of the test."); *Evans*, 552 F. Supp. 2d at 654.

### 2. Adverse Employment Action

Donahoe argues that Lopez cannot establish that he suffered an adverse employment action and repeatedly asserts that Lopez ultimately obtained relief for all of his grievances.  *See* M. for Summ. J. 14–16, Dkt. No. 51.  The Supreme Court

held in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) that, unlike the definition of "adverse employment actions" applicable to a Title VII discrimination claim, an adverse action in a retaliation claim is not limited to "ultimate employment decisions" that "affect the terms and conditions of employment." *Id.* at 64. Donahoe suggests that the "ultimate employment decisions" standard used in status discrimination claims governs retaliation claims as well, M. for Summ. J. 13 (citation omitted), but that assertion ignores the Supreme Court's holding in *Burlington Northern*, which expressly abandoned that standard in favor of a more expansive interpretation of "adverse employment actions." *Burlington N.*, 548 U.S. at 67 ("We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment actions.'").

After *Burlington Northern*, the anti-retaliation provision of Title VII protects employees "not from all retaliation, but from retaliation that produces an injury or harm". *Id.* The plaintiff may demonstrate that an employment action satisfies this requirement by showing that "a reasonable employee would have found the challenged action materially adverse," meaning that the action might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1217—18 (D.C. Cir. 2006)) (internal quotations omitted); *accord. McCoy*, 492 F.3d at 559–60 (discussing *Burlington*'s holding); *Rodriguez v. Cooper Cameron Valves TBV Techno, Inc.*, No. H-12-0764, 2014 WL 3044797, at *6 (S.D. Tex. July 3, 2014) (same). In enunciating this standard, the Supreme Court made clear that "Title VII 'does not set forth 'a general civility code for the American workplace.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (quoting *Burlington N.*, 548 U.S. at 68). This standard "separate[s] significant from trivial harms" and "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (quoting Burlington N., 548 U.S. at 68).

17

In the case at hand, Donahoe asks the Court to treat as dispositive his allegation that all of the employment actions about which Lopez complains were subsequently resolved in Lopez's favor, but the "standard for adverse employment action is tied to the challenged retaliatory act, 'not the underlying conduct that forms the basis of the Title VII Complaint.'" *Stone v. La. Dept. of Revenue*, 590 F. Appx. 332, 341 (5th Cir. 2014) (per curiam, unpublished) (citing *Burlington N.* 548 U.S. at 68). Viewed in this way and in the light most favorable to Lopez, the suspension of Lopez's driving privileges constitutes an adverse employment action because Lopez states in his declaration that he suffered a reduction in the hours he was allowed to work—and by extension his ability to earn—as a result of the suspension. Dkt. No. 53 Ex. 8 ¶ 12. Furthermore, Donahoe points to a portion of Lopez's deposition in which he testified that he received back pay for the 14-day period in which he was suspended, Dkt. No. 53 Ex. 1 61:7–16; that evidence permits the reasonable inference that the notice of suspension carried with it the threat of lost pay. *See id.* Therefore, in context and viewed in the light most favorable to Lopez, the suspension of his driving privileges for the accident which occurred on August 7, 2008, and the notice of 14-day suspension issued December 4, 2008, would deter a reasonable employee from making or supporting a discrimination charge. *Compare, e.g., Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (holding that "rude treatment" by supervisor without more was "petty slight[], minor annoyance[], and simple lack of good manners"), *with Haire* 719 F.3d at 367–68 (holding that disqualification for overtime pay altered income and supplied enough evidence of adverse employment action to survive summary judgment). Finally, giving notice of intent to remove, i.e., fire, Lopez, *see* Lopez. Decl. ¶ 14, also would dissuade a reasonable person from making or supporting a discrimination claim. *See, e.g., Arango*, 20 F. Supp. 3d at 567 (holding "Plaintiff's termination in March 2011 clearly qualifies as an adverse employment action")

   3. <u>Causal Connection Between Protected Activity and Adverse Employment Action</u>

A plaintiff seeking to establish a *prima facie* case of retaliation must demonstrate a causal connection between his participation in an activity considered protected under Title VII and the employer's adverse employment decision. *McCoy*, 492 F.3d at 557. To succeed on his retaliation claim, a plaintiff must demonstrate that his protected activity was a but-for cause of the employer's adverse employment action rather than simply a motivating factor. *Nassar*, 133 S. Ct. at 2534. When considered with other factors bearing on the question, temporal proximity between the protected activity and the alleged retaliatory actions "may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Circuit 1993)). However, temporal proximity alone is not sufficient to prove a causal connection. *Strong v. Univ. Healthcare Sys., LLC.*, 482 F.3d 802, 808 (5th Cir. 2007) (repeating this holding "[t]o prevent future litigants from relying on temporal proximity alone to establish but for causation").

In his response to Donahoe's motion for summary judgment, Lopez cites temporal-proximity cases to support his causation argument. *See* Dkt. No. 53 at 9. Recently in *Feist v. La. Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013), the Fifth Circuit highlighted a pair of cases circumscribing the outer boundaries of a permissible inference of causation drawn from temporal proximity alone. "'[A] time lapse of up to four months' may be sufficiently close, *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir.2001), while a five month lapse is not close enough without other evidence of retaliation, *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002)." *Id.* Additional evidence may include an "employment record that does not support dismissal, or an employer's departure from typical policies and procedures." *Id.* at 455 (citing *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1024 (5th Cir. 2011)).

The summary-judgment record contains sufficient evidence which, viewed in the light most favorable to Lopez, supports an inference of causation. The first

adverse employment action identified by Lopez, suspension of his driving activities, occurred on August 7, 2008.  *See* Lopez. Decl. ¶ 12.

From the undisputed evidence, a reasonable fact finder could infer that the letter was sent after Jenkins's arrival and before the August 7, 2008, suspension, an eight-month period.  Lopez states in his response that Lopez's "representation [of Trevino] was ongoing at the time Jenkins began stacking discipline against Lopez." Dkt. No. 53 at 9.  He supplies no citation to support that assertion, however.  *See id*. In his declaration, Lopez avers that he assisted Trevino, but he does not specify when he did so.  *See* Lopez Decl. ¶ 9.  Trevino's declaration, Dkt. No. 53 Ex. 9, also does not set forth specific dates surrounding the letter or his EEO activity.[3]  Trevino states that he had a conversation with Finley "[s]hortly after . . . Jenkins came to Brownsville," Dkt. No. 53 Ex. 9 ¶ 2, in late 2007.  Trevino then describes events which allegedly led to the letter's writing without setting forth the dates on which it was sent.  *See id*. ¶¶ 2–5.  He concludes this portion of his declaration by stating that "[s]hortly after, this letter was sent, . . . my life became a living hell."  *Id*. ¶ 5; *see also* Lopez Decl. ¶ 9 (linking alleged discipline to sending of letter).

Since the summary-judgment record shows that the letter was written within eight months before the first incident of alleged retaliation and that length of time is longer than the four-month window permitting a retaliation inference from temporal proximity alone, *see Feist*, 730 F.3d at 486, the Court examines whether Lopez has supplied additional evidence of retaliation, *see id*. at 486–87.  Lopez's declaration includes an allegation that Jenkins departed from established policy when he suspended Lopez's driving privileges by conducting the investigative interview himself, suspending his privileges before that interview, and failing to follow the 14-day timeline required to make a suspension decision.  *See* Lopez Decl. ¶ 12.  This evidence coupled with the temporal proximity suffices, when viewed in a light favorable to Lopez, to make out a prima facie case of causation.  *See Feist*, 730

---

[3]  Though Donahoe objects to these paragraphs of Trevino's declaration, Donahoe raises challenges to Finley's statements as inadmissible hearsay.  *See* Reply to M. for Summ. J. 6, Dkt. No. 55.  The Court does not rely on these paragraphs to establish Finley's statements, however, and therefore does not reach these objections.

F.3d at 455 (additional evidence may include "employer's departure from typical policies or procedures"); *Schroeder*, 664 F.3d at 1024 (collecting cases including *Smith v. Xerox Corp.*, 371 F. App'x. 514, 520 (5th Cir. 2010) which "[found] causal link where terminated employee 'was a long-tenured employee with no disciplinary history prior to 2005 who was subjected not only to termination shortly following the EEOC complaint but also to suspicious new charges of wrongdoing for arguably minor incidents following that complaint.'").

### C. Harassment by Hostile Work Environment Claim

Unlike a traditional discrimination claim under Title VII, a hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). To prevail on a hostile work environment claim, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (2002)). As the en banc Fifth Circuit explained in 2013, a Title VII plaintiff's *prima facie* case of harassment stemming from a supervisor's conduct has four elements:

> (1) that the employee belongs to a protected class;
> (2) that the employee was subject to unwelcome . . . harassment;
> (3) that the harassment was based on [a protected characteristic]; and
> (4) that the harassment affected a 'term, condition, or privilege' of employment.
> *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 162–63 (5th Cir. 2007).
> To affect a term, condition, or privilege of employment, the harassing conduct 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Aryain v. Wal–Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008) (alteration in original) (quoting *Lauderdale*, 512 F.3d at 163). We use an objective 'reasonable person' standard to evaluate severity and pervasiveness. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 82 (1998). Ultimately, whether an

environment is hostile or abusive depends on the totality of circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

*E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc) (alterations in original except first ellipsis); *accord, e.g., Williams-Boldware v. Denton County, Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)) (setting forth four elements of *prima facie* case); *Hernandez*, 670 F.3d at 651. Analysis in the totality of the circumstances entails consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," as well as any psychological effect such harassment may have on the employee. *Harris,* 510 U.S. at 23.

Donahoe concedes that Lopez belongs to a protected group. *See* M. for Summ. J. 17, Dkt. No. 51. He argues that Lopez has not supplied competent summary-judgment evidence that the alleged acts of Jenkins and other supervisors in the Brownsville post office were based on race and, even if he has, the competent summary-judgment evidence does not establish activity severe or pervasive enough to make out a prima facie case.[4] *See id.* at 18—19. Lopez counters with his declaration and the declarations of eight co-workers setting forth various alleged incidents of Jenkins's and other post office supervisors' discriminatory conduct. *See* Part I.B, *supra*. In his reply, Donahoe objects to portions of these declarations on grounds of, inter alia, hearsay, relevance, and lack of personal knowledge. *See* Dkt. No. 54 at 2–13. However, the Court need not reach these objections raised in Donahoe's reply because, assuming for the sake of argument only that this evidence is competent summary-judgment evidence, it does not create a genuine fact issue on Lopez's harassment claim.

---

[4] Donahoe also argues in a conclusory fashion that Lopez has failed to show that the alleged discriminatory incidents were retaliatory or based on race. *See* Dkt. No. 51 at 18. In the next sentence of his motion for summary judgment, he states, however, "[i]f true, the comments purportedly made by Jenkins and his subordinate supervisors could be considered offensive and made with questionable business judgment . . . ." *Id.* He then recites a rule which goes to the pervasiveness inquiry: "'mere utterance of an ...epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* (quoting *Harris*, 510 U.S. at 21).

To establish that challenged activity was based on race, the plaintiff must supply "specific evidence of racist remarks," and not just general allegations of racism. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 (5th Cir. 1996) (holding that a plaintiff's allegation that defendant "routinely made racist remarks" was insufficient to survive summary judgment without specific evidence of such remarks). A prima facie harassment claim also requires the plaintiff to demonstrate that the harassment complained of was "sufficiently severe or pervasive 'to alter the terms and conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). However, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not considered to be sufficiently severe as to alter the terms or conditions of that employee's employment. *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971).

Lopez's declaration, Dkt. No. 53 Ex. 8, viewed in the light most favorable to him does not create a genuine issue of fact on his harassment claim. First, Lopez states that he and Trevino made unspecified observations which led them to write their letter of complaint to Jenkins's superiors. *See id.* ¶ 5. He also states that "it was obvious" that Jenkins treated non-Hispanic employees more favorably and generally avers that Jenkins treated non-Hispanic employees like equals and Hispanic employees as though they were lazy. *See id.* ¶ 6. These conclusory and purely subjective statements do not create a fact issue without further substantiation. *See, e.g., Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)) ("This Court has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment."); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence."); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) ("The only evidence supporting [plaintiff's] claim regarding her

second complaint . . . was [plaintiff's] own self-serving generalized testimony stating her subjective belief that discrimination occurred. Such is simply insufficient to support a jury verdict in plaintiff's favor.").

Turning then to the examples in the summary-judgment record, Lopez states in his declaration that he observed Jenkins and other supervisors yelling at Hispanic postal employees, and Jenkins and those supervisors also made unspecified denigrating remarks. *See* Dkt. No. 53 Ex. 8 ¶¶ 6, 8, 13. He does not aver, even in a conclusory fashion, that any supervisor yelled a racial slur or mentioned race when yelling even indirectly, however. *See id.*; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (holding that a comment "must be both objectively and subjectively offensive"). Nor does he point to other summary-judgment evidence linking the alleged yelling and denigrating remarks to the race of the employee except his own conclusory statements and those of other post office employees. *See Daniels v. BASF Corp.*, 270 F. Supp. 2d 847, 855 (S.D. Tex. 2003) (granting summary judgment for defendant on harassment claim based on incidents of supervisor raising voice at employee because that incident and four others were "not facially racial, and . . . [plaintiff] has not linked [yelling] to her race"). Lopez does not specify the denigrating remarks; other post office employees describe an incident at a retirement celebration at which Jenkins said "[w]e are not smart." Decl. of Daniel Garcia ¶ 3. Viewed in the light most favorable to Lopez, this statement, if admissible, refers to the entire Brownsville post office staff, but drawing that inference does not objectively transform a rude remark into a race-based insult on this record. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 224 (5th Cir. 2001) (affirming grant of summary judgment based in part on complaint that supervisor called employee stupid because "[t]he word 'stupid' is not an epithet or a slur referring to a pregnant woman, it simply denotes a lack of intelligence." And therefore fails to make out prima facie case); *Bryan v. Chertoff*, 217 F. App'x. 289, 294 (5th Cir. 2007) (per curiam, unpublished) (finding insufficient evidence of hostile work environment where supervisor yelled at employees but "according to [plaintiff]'s deposition testimony, [the supervisor]'s yelling was directed at all

employees"); *Daniels*, 270 F. Supp. 2d at 854 (granting summary judgment where plaintiff could not articulate why question supervisor asked about national origin of pager possessed by employee was race-based).

Lopez also declares that Finley reported Jenkins's "f*ing Mexicans" comment to him.[5]  *See* Dkt. No. 53 Ex. 8 ¶¶ 4–5.  Further, Lopez describes two incidents in which Hispanic postal employees received less favorable treatment than non-Hispanic employees.  *See* Lopez Decl. ¶¶ 7–8.  However, he does not specify when those incidents occurred.  *See id.*; *see also Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (observing that plaintiff did not attempt to estimate frequency of offensive conduct at all when finding it insufficiently pervasive).   Moreover, those incidents involved different treatment of an employee with an off-the-job toe injury and discipline of a white supervisor who allegedly disobeyed a direct instruction given by Jenkins.  *See* Lopez Decl. ¶¶ 7–8.  Lopez does not argue that this conduct can be fairly characterized as physically threatening, and the absence of evidence of when this conduct occurred within the 5-year period between 2008 and the date on which Lopez created his declaration militates against a conclusion that it was severe or pervasive.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 342, 348  (5th Cir. 2007) (collecting cases and holding that four categories of allegedly harassing remarks over several weeks such as describing inner-city children as "ghetto children" not sufficiently severe or pervasive); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding one supervisorial harangue, use of mocking tone on one occasion, and comparison of employee to needy ex-girlfriend insufficiently severe or pervasive); *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 827 (S.D. Tex. 1998)) (holding three

---

[5] Assuming arguendo that this evidence is admissible despite the rule against hearsay, that undisputedly single comment, standing alone, does not suffice to support a harassment claim based on a hostile working environment.  *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1993)); *see also Shepherd v. Comptroller of Pub. Accounts of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (internal citation omitted) ("mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment.").  However, as explained in the text, the Court analyzes this alleged statement together with all of the evidence assuming as arguendo that it is admissible.

incidents of alleged discriminatory statements to be insufficiently severe or pervasive to survive summary judgment).

Finally, assuming arguendo that they are admissible, the declarations of other Brownsville post office employees do not create a genuine issue of material fact on Lopez's harassment claim considering this summary-judgment record in the totality of the circumstances. The other employees report, for example, that Jenkins mocked their accents in their presence, Dkt. No. 53 Ex. 4 ¶ 5, and another states that Jenkins used the term "Mess-i-cans" to describe postal employees, complained that "the Mess-i-cans are taking Texas back," and would meet with customers who had Anglo-sounding surnames but not customers with Hispanic-sounding surnames. *Id.* Ex. 2 ¶¶ 4–5. Lopez, however, makes no effort to show that he overheard any of the comments alleged or witnessed any of the alleged conduct, and he does not point to evidence in the summary-judgment record showing that he was aware of these comments or the Jenkins's alleged treatment of customers. *See, e.g., Hernandez v. City of Corpus Christi*, 820 F. Supp. 2d 781, 802 (S.D. Tex. 2011) (granting summary judgment for defendant on harassment claim and stating "Plaintiff has presented the affidavits of two former colleagues . . . in which the affiants relate certain instances in which Smith is claimed to have made derogatory remarks towards Mexican Americans, they do not claim that Plaintiff heard these statements."). This Court does not treat evidence of other alleged incidents of discrimination as always irrelevant. *See generally Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012) (discussing cases in which other incidents of same-category discrimination may be admitted for certain purposes). Instead, the Court factors the lack of evidence of Lopez's knowledge of the other alleged incidents of discrimination into the totality of the circumstances. *See id.* (citing *Ramsey*, 286 F.3d at 268) (holding two incidents in ten-year period of patently offensive slurs of Mexican-Americans did not create fact issue); *Hernandez v. City of Corpus Christi*, 820 F. Supp. 2d at 802 (analyzing lack of knowledge of other incidents consistent with treatment as one factor to be considered). Based on the totality of the circumstances, the summary-judgment record, viewed in the light

26

most favorable to Lopez, does not create a genuine fact issue as to whether Lopez was subjected to sufficiently severe or pervasive race-based harassment to alter a term or condition of his employment. *See Hernandez*, 670 F.3d at 653.

As even Donahoe tacitly concedes, *see* Dkt. No. 53 at 18, if true, the comments of Jenkins and other non-Hispanic supervisors in the Brownsville post office demonstrate poor judgment—and they qualify, according to the Fifth Circuit, as objectively offensive meaning that they are offensive to a reasonable person. *See Hernandez*, 670 F.3d at 653 (observing that district court held that slurs against Mexican-Americans were objectively offensive). Nothing in this opinion condones any of the behavior alleged here, yet "Title VII does not impose 'a general civility code.'" *Vance*, 133 S. Ct at 2455 (Ginsburg, J., dissenting) (quoting *Oncale*, 523 U.S. at 81). Those seeking shelter from "the ordinary tribulations of the workplace, for example, sporadic use of abusive language or generally boorish conduct," cannot find refuge in Title VII. *Id.* (quotation omitted).

## V. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Donahoe's motion for summary judgment. Dkt. No. 53. The Court **DISMISSES** Plaintiff Lopez's Title VII intentional-discrimination and harassment claims **WITH PREJUDICE**, leaving his retaliation claim pending.

It is so ORDERED.

SIGNED this 23rd day of March, 2015.

Hilda Tagle
Senior United States District Judge

27